**COOPER TIRE & RUBBER COMPANY, Appellant,**

v.

**Oscar MENDEZ, Jr., Individually and as Administrator of the Estate of Maria Luisa Mendez, Deceased, and as Next Friend of Laura Maria Mendez and Daniel Mendez, Minor Children, Oscar Mendez, Sr., Carlos Duran, Ruben Duran, Guillermo Duran, Cynthia Recoder, Individually and as Administratrix of the Estate of Adela Duran, Deceased, Melissa Denise Snyder, Individually and as Administratrix of the Estate of Manuel Duran, Deceased, and Guillermina Duran, Individually and as Next Friend of Kevin Scott Duran, A Minor Child, Appellees.**

No. 08–01–00340–CV.

Court of Appeals of Texas, El Paso.

Oct. 14, 2004.

W. Wendell Hall, Fulbright & Jaworski, San Antonio, for Appellant.

John Robert King, Law Office of John King, McAllen, John J. McKetta, Graves Dougherty Hearon & Moody, P.C., Austin, Ronald J. Stading, El Paso, for Appellees.

Before Panel No. 1 LARSEN, McCLURE, and CHEW, JJ.

## OPINION

DAVID WELLINGTON CHEW, Justice.

This manufacturing defect case arises from a tragic single-vehicle accident, which resulted in the deaths of four occupants and serious injuries to three other occupants. Appellees, the surviving driver and occupants and estate administrators of the decedents (collectively, "the Plaintiffs") sued Appellant Cooper Tire & Rubber Company ("Cooper Tire"), asserting that a tire on the vehicle failed due to a manufacturing defect that caused the tire's belt separation. The jury found in favor of the Plaintiffs and the trial court rendered judgment on the verdict against Cooper Tire in the total amount of $11,508,080. On appeal, Cooper Tire brings ten issues, with various sub-issues, for appellate review, including legal and factual sufficiency challenges to the jury's findings, the admissibility of certain evidence and expert testimony, jury charge error, improper

jury argument, and jury misconduct. We affirm the trial court's judgment.

## BACKGROUND

On June 29, 1997, a Sunday afternoon, Oscar Mendez, Sr. and his wife were traveling with Manuel Duran and his relatives on a trip to Albuquerque, New Mexico in a Mazda minivan. The minivan belonged to Celia Salas, one of the passengers. At a rest stop in Truth or Consequences, New Mexico, Mr. Mendez took over as the driver. When they were approximately twenty miles from Albuquerque, the tread separated on the minivan's left rear tire, a Sigma Grand Sport Radial Tire manufactured by Cooper Tire. According to witnesses, the minivan was driving normally when all of a sudden they observed a dirt clod (or what appeared to be dirt) fall from the left rear tire. Within seconds, the minivan crossed into the right-hand lane and started to drive onto the shoulder of the road. It appeared to witnesses as if the driver was trying to bring the minivan back onto the road when it started to roll over. Six of the seven passengers in the minivan were ejected. One victim died at the scene and three other victims were pronounced deceased upon arrival to the hospital.

In this lawsuit, the Plaintiffs claimed the failed tire had a manufacturing defect that caused the accident and the resulting deaths and injuries. Cooper Tire denied there was a defect in the tire and asserted a negligence claim against the driver, Mr. Mendez. The jury found that there was a manufacturing defect in the tire at the time it left Cooper Tire's possession and that it was a producing cause of the occupants' injuries. The jury also found that Mr. Mendez was not negligent in causing the accident and that there was clear and convincing evidence that Melissa Snyder was the biological daughter of decedent Manuel Duran.

## MANUFACTURING DEFECT

### Jury Charge: Omission of "Flaw" Element

In Issues Two and Three, Cooper Tire contends the Plaintiffs failed to obtain a jury finding on the "flaw" element of their manufacturing defect claim and that the trial court's refusal to incorporate the "flaw" element is harmful error.

■■■ To recover in strict liability for a manufacturing defect, the plaintiff must show that the finished product was defective at the time the product left the seller and that the defect was a producing cause of the plaintiff's injuries. *See Torrington Co. v. Stutzman,* 46 S.W.3d 829, 844 (Tex. 2000); *American Tobacco Co., Inc. v. Grinnell,* 951 S.W.2d 420, 426 (Tex.1997), *quoting* Restatement (Second) of Torts § 402A (1965). A product has a manufacturing defect if its construction or quality deviates from the specifications or planned output in a manner that renders it unreasonably dangerous. *Torrington,* 46 S.W.3d at 844; *Grinnell,* 951 S.W.2d at 434.

The trial court submitted the following question on the Plaintiff's liability theory:

### QUESTION 1

Was there a manufacturing defect in the tire at the time it left the possession of Cooper Tire & Rubber Company that was a producing cause of the injuries to Maria Luisa Mendez, Adela Duran, Manuel Duran, and Oscar Mendez, Sr.?

A 'defect' means a condition of the product that renders it unreasonably dangerous. An 'unreasonably dangerous' product is one that is dangerous to an extent beyond that which would be contemplated by the ordinary user of the product, with the ordinary knowl-

edge common to the community as to the product's characteristics.

Cooper Tire objected to the jury question on the basis that it lacked a definition of manufacturing defect.[1] Cooper Tire also filed with the court its requested instruction to accompany Question 1.[2]

On appeal, Cooper Tire argues that the Plaintiffs failed to meet their burden in proving and obtaining a jury finding on each element of their cause of action. In response, the Plaintiffs assert that there is no such thing as a "flaw element" separate from the manufacturing defect itself. We agree.

 Cooper Tire cites to no authorities to support its claim that the Plaintiffs must prove a "flaw" element beyond obtaining a finding of a defect. Under *Torrington* and *Grinnell*, a plaintiff shows that a product has a manufacturing defect through evidence that the finished product deviates from the specifications or *planned output* in a manner that renders it unreasonably dangerous. *See Torrington*, 46 S.W.3d at 844; *Grinnell*, 951 S.W.2d at 434. We observe that Cooper Tire's requested instruction is similar to a definition of manufacturing defect that appears in a footnote in *USX Corp. v. Salinas*, 818 S.W.2d 473, 482 n. 8 (Tex.App.-San Antonio 1991, writ denied). The *Salinas* case involved a marketing defect claim, but the court in dicta cited E. Carstarphen, *Product Defects*, 2 Texas Torts and Remedies § 41.01[2] (1991), for the proposition that "[a] manufacturing defect exists when a product does not conform to the design

standards and blueprints of the manufacturer and the flaw makes the product more dangerous and therefore unfit for its intended or reasonably foreseeable uses." *Salinas*, 818 S.W.2d at 482 n. 8. The *Salinas* Court apparently provided a more narrow definition of manufacturing defect than is recognized under leading Texas case law. We do not find the *Salinas* definition controlling in this case. We conclude no "flaw" element was omitted in the jury question nor did the trial court err in refusing to incorporate Cooper Tire's "flaw" instruction. Issues Two and Three are overruled.

### Sufficiency of Evidence on Manufacturing Defect

In Issue One, Cooper Tire challenges the legal and factual sufficiency of the evidence to support the jury's finding of a manufacturing defect in the tire in question at the time it left Cooper Tire's possession. Within this issue, Cooper Tire also contends the trial court erred in admitting expert testimony from three of the Plaintiffs' witnesses and erred in admitting a technical report from RAPRA Technology, Ltd., and testimony from Richard Angell, a former Cooper Tire employee.

### Standards of Review

 In reviewing a legal sufficiency challenge where the complaining party on appeal did not bear the burden of proof at trial, we analyze the issue as a "no-evidence" challenge. *Croucher v. Croucher*, 660 S.W.2d 55, 58 (Tex.1983). In our re-

---

**1.** Cooper Tire argued that the pattern jury charge submission for manufacturing defect is incomplete because it does not differentiate for the jury between a manufacturing defect and other types of defect, such as design defect and marketing defect. Its primary contention was that the submitted definition did not require the jury to find that the prod-

uct in question had a flaw, that is, a manufacturing defect.

**2.** Cooper Tire requested the following instruction: "AA 'manufacturing defect' exists when a product does not conform to the design standards and blueprints of the manufacturer."

view, we consider the evidence in a light that tends to support the jury's finding and disregard all evidence and inferences to the contrary. *Southwest Key Program, Inc. v. Gil–Perez*, 81 S.W.3d 269, 274 (Tex. 2002). If there is more than a scintilla of evidence to support the finding, the legal insufficiency challenge fails. *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 48 (Tex. 1998). We will sustain a no-evidence challenge when: (1) the record discloses a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of the vital fact. *Marathon Corp. v. Pitzner*, 106 S.W.3d 724, 727 (Tex.2003). The evidence is no more than a scintilla "[w]hen the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence...." *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex.1983). More than a scintilla exists when the evidence "rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." *Transp. Ins. Co. v. Moriel*, 879 S.W.2d 10, 25 (Tex.1994).

In reviewing a challenge to the factual sufficiency of the evidence, we consider all the evidence both supporting and contradicting the jury's finding. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex.1986). We will set aside the judgment only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and manifestly unjust. *Id.* It is not within the province of the reviewing court to interfere with the jury's resolution of conflicts in the evidence, or to pass on the weight or credibility of the witnesses' testimony. *Campbell v. Salazar*, 960 S.W.2d 719, 724 (Tex.

App.-El Paso 1997, pet. denied). Where there is conflicting evidence, the jury's verdict on the matter is generally regarded as conclusive. *Id.*

We review evidentiary rulings under the abuse of discretion standard. *Owens-Corning Fiberglas Corp. v. Malone*, 972 S.W.2d 35, 43 (Tex.1998). A trial court abuses its discretion when it acts without regard for any guiding rules or principles. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241-42 (Tex. 1985). Unless the trial court's erroneous evidentiary ruling probably caused the rendition of an improper judgment, we will not reverse the ruling. *See* Tex.R.App. P.44.1; *Owens-Corning*, 972 S.W.2d at 43.

### Expert Witness Testimony

We first address Cooper Tire's complaints concerning the qualifications and reliability of Plaintiffs' three expert witnesses: Richard "Rex" Grogan, Dr. Alan Milner, and Jon Crate. Cooper Tires argues that the trial court erred in admitting this expert testimony, and therefore, this Court cannot consider that testimony in conducting our evidentiary review. *See Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex.1997).

Texas Rule of Evidence 702 provides: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise." Tex.R.Evid.702. The party offering the expert's testimony bears the burden to prove that the witness is qualified under Rule 702. *See Gammill v. Jack Williams Chevrolet, Inc.*, 972 S.W.2d 713, 718 (Tex. 1998). Whether a witness is qualified as an expert is within the trial court's discretion. *E.I. du Pont de Nemours & Co., Inc.*

*v. Robinson,* 923 S.W.2d 549, 558 (Tex. 1995).

■■■■ Rule 702 also requires that an expert's testimony be relevant and based on a reliable foundation. *See Robinson,* 923 S.W.2d at 556. In *Robinson,* the Texas Supreme Court identified six non-exclusive factors to consider in determining whether scientific evidence is reliable, and thus, admissible under Rule 702. *Id.* at 557. These *Robinson* factors are: (1) the extent to which the theory has been or can be tested; (2) the extent to which the technique relies upon the subjective interpretation of the expert; (3) whether the theory has been subjected to peer review and/or publication; (4) the technique's potential rate of error; (5) whether the underlying theory or technique has been generally accepted as valid by the relevant scientific community; and (6) the nonjudicial uses which have been made of the theory or technique. *Robinson,* 923 S.W.2d at 557. The *Robinson* factors, however, do not always apply to experts who testify on the basis of specialized knowledge. *See Gammill,* 972 S.W.2d at 726. "Experience alone may provide a sufficient basis for an expert's testimony in some cases, but it cannot do so in every case." *Id.* While expert testimony must still be proven reliable pursuant to Rule 702, in such cases, the court in conducting its gatekeeper analysis "may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Id.* Nevertheless, Rule 702 demands that the court "evaluate the methods, analysis, and prin-

ciples relied upon in reaching the opinion ... [in order to] ensure that the opinion comports with applicable professional standards outside the courtroom and that it 'will have a reliable basis in the knowledge and experience of [the] discipline.'" *Gammill,* 972 S.W.2d at 725-26; *see also* TEX. R.EVID. 702. The trial court's duty is not to determine whether the expert's conclusions are correct, but rather whether the analysis used to reach them is reliable. *Gammill,* 972 S.W.2d at 728.

### Richard "Rex" Grogan's Testimony

■■■ Richard "Rex" Grogan is a tire failure analyst. In 1947, Mr. Grogan joined Dunlop Tire Company in Birmingham, England and worked in its technical department, the compounds laboratory. Mr. Grogan became a compounder and was engaged in developing new rubber compounds for all aspects of tires and inner tubes.[3] Around 1960, Mr. Grogan was transferred to the tire examination laboratory where he later served as Acting Manager.[4] During that time, Mr. Grogan and the manager established the x-ray department, which became their responsibility. Mr. Grogan then served as Deputy Manager in the tire textile laboratory for about a year before being appointed in 1964 to take over the technical service section, a department of five tire examiners whose function was to examine returned tires and alert the technical department about possible future service defects.[5] In this position, Mr. Grogan repre-

3. According to Mr. Grogan's deposition testimony, admitted into evidence for the pretrial *Daubert* hearing, he worked from 1947 to 1956 as a junior technical assistant and technical assistant compounder, preparing chemical formulas for tire components.

4. Mr. Grogan explained in deposition testimony that he worked his way up through the ranks of the tire exam lab. In that lab, Dun-

lop employees examined new tires manufactured by the company and by its competitors. From 1956 to 1964, Mr. Grogan worked on steel-belted radial tires, which Dunlop was developing.

5. Mr. Grogan explained in deposition testimony that in 1964, he worked in the tire performance department as coordinator of tire examination services. In that department,

sented the company in legal matters as an expert witness and organized and ran training courses for police and forensic scientists on behalf of the British government.

Around 1967, Mr. Grogan again took over management of Dunlop's tire examination laboratory and x-ray department, but retained his position in the technical service section.[6] Mr.Grogan left Dunlop in 1980 and became an independent pneumatic tire consultant. In 1982, Mr. Grogan developed a course in forensic tire examination for the Institute of Police Technology Management in Jacksonville, Florida, in conjunction with North Florida University and joined their adjunct faculty. In 1987, he published a book entitled, "An Investigator's Guide to Tire Failures," which he revised and expanded in 1999.[7] Mr. Grogan has also written thirty to forty technical articles on tire failure analysis in publications such as the Journal of the Forensic Science Society and the Institute of Accident Investigator's Journal. Between 1984 and 1987, Mr. Grogan wrote a monthly column in Tires and Accessories, one of the tire trade journals.

Mr. Grogan's qualifications included specialized knowledge and extensive experience in tire failure analysis and tire examination. Based on the evidence before the trial court, the Plaintiffs clearly met their burden in showing that Mr. Grogan was qualified to be an expert on the specific issues in this case. See Broders v. Heise, 924 S.W.2d 148, 152 (Tex.1996)(trial court's role is to ensure that those who purport to be experts truly have expertise concerning the actual subject about which they are offering an opinion). Therefore, the trial court reasonably concluded that Mr. Grogan possessed the requisite knowledge, experience, and training to testify in this case.

■ Cooper Tire also argues that Mr. Grogan's testimony should have been excluded because his opinions lacked a reliable scientific or factual basis. At trial, Mr. Grogan commented on a videotape produced by Cooper Tire called, "Design for Quality," to explain to the jury how a tire is made. Mr. Grogan explained that a tire is constructed in layers. A tire is built out of unvulcanized rubber components. During the process, sheets of brass-plated steel cords and the rubber form the belt material. Mr. Grogan explained that brass is the adhesive because the rubber will not adhere to steel. In the manufacturing process, Cooper Tire used canvas as protective material to prevent the rubber sheets from sticking to each other. Once the tire goes through the vulcanization process, or the cure, the rubber layers bond and the various components lose their separate identity.

employees analyzed statistical data from returned tires to predict the adequacy or weakness of any particular design and based on their analyses suggested design changes.

**6.** Mr. Grogan took over the tire exam lab, but retained the x-ray section, the technical service section, and the cure section, a section of the tire exam lab where employees conducted cure analysis for various products. In the tire exam lab, the adhesive qualities of various rubber components in the finished product were checked. He also managed part of the test house examination section, where new tires were tested to ultimate failure for quality assurance.

**7.** In his deposition, Mr. Grogan stated that two tire examiners, David Price and John Manderson, each reviewed his book in the Institute of Traffic Accident Investigators and the Journal of The Forensic Science Society, respectively. Mr. Price and Mr. Manderson are forensic scientists, whom Mr. Grogan trained while he worked at Dunlop. They also reviewed Mr. Grogan's second book as did Phil Sacks.

Mr. Grogan testified that his method of conducting a tire examination begins with a visual and tactile examination of the tire. Over the years, Mr. Grogan has produced a data sheet with various sequential questions he uses in his investigation. For example, Mr. Grogan's queries concern information such as the type of tire, its condition, features, the manufacturer, when it was produced and where, and the tread pattern. Mr. Grogan also inspects the separated components and the wheel and sidewall for any damage or bead grooving—which is damage to the rubber caused by movement where the tire and wheel meet. He then visually inspects the inside of the tire. At this stage, Mr. Grogan checks for damage, evidence of repairs, signs of stress, and indicators that the tire was run underinflated or deflated. Mr. Grogan also inspects the condition of the valve. After forming a preliminary opinion, Mr. Grogan inspects the tire a second time several days later.[8] Mr. Grogan employs directional lighting in conducting his examination, takes many photographs, and frequently x-rays the tire to view the steel inside the rubber. At times, Mr. Grogan utilizes various specialists, like an analytical chemist, once he has formed his preliminary opinion.

After examining the tire in this case, Mr. Grogan concluded that the tire failed by tread and belt separation due to contamination of the skim stock. In his inspection, Mr. Grogan found liner marks or line impressions, which he opined were the cross-woven treads of the canvas used to protect the rubber components from sticking to each other. According to Mr. Grogan, the cross-woven liner marks, could be nothing else but imprints from the canvas. In reaching his conclusion about the cause of the tread belt separation, Mr. Grogan considered a number of factors. First, he observed looseness at the edge of the belt, that is, all along one edge the steel is loose and is no longer bonded to the tread and separated. Actual steel cord was exposed and the edges were coming out of place with more and more extensive separation observable towards the failed area in which a large chunk was loose. Second, he observed liner marking, which occurs between the interfaces or separate components, indicating poor adhesion between the components. Mr. Grogan concluded that the interface was able to separate, which he opined should never occur.

Mr. Grogan explained the significance of the liner marks in the underside of the tire tread. During vulcanization, the separate components of a tire fuse to form one structure. All the separate components should lose their identity, but if interfaces are observable, it indicates that the tire has separated along the lines where the components went into the mold, which should never occur if the material is in proper condition to make a tire. Mr. Grogan further stated that observing liner marks means the tire came unglued and never properly fused. Mr. Grogan opined that if a manufacturer allows that to happen, it has produced an area of weakness in the tire, which can cause the tire to separate, and is a very dangerous condition.

Mr. Grogan also believed that from a manufacturing standpoint, a contaminant was the source of the problem in this particular tire. His opinion was based on the fact that the tire had come apart at an interface between two components, indicating that something had interfered with the stickiness of the two surfaces. Mr. Grogan could not identify the contaminant visually, so he sent the tire to RA-PRA Technology, a firm of rubber spe-

8. Mr. Grogan also similarly described his ex-amination procedure in deposition testimony.

cialists in England, which tested areas of the tire per his instructions. Mr. Grogan stated that RAPRA has a worldwide reputation and is widely used, that he knew they had absolutely the highest competence, and that RAPRA produced this kind of information for experts such as himself. RAPRA's technical report identified a hydrocarbon wax in the tested areas. Mr. Grogan knew from his experience as a compounder that there should be no waxes in the compounding of the rubbers for the stock in making the ply layers. Mr. Grogan explained that compounds that cover steel wires are commonly called skim stock, as they skim over the top of the wires. He stated that this is the most sensitive compound in the tire because it has to bond to steel and bond to itself and is where all the road stresses are first encountered.

According to Mr. Grogan, adhesion is absolutely critical in that compound area and softeners, oil, or waxes are not put in there. Hydrocarbon waxes or oils, however, are appropriate for the sidewall or the tread in order to prevent deterioration or cracking caused by ozone in the air. Mr. Grogan explained that when he was a compounder he was familiar with microcrystalline waxes and stated that such waxes move very little and can bleed through the compound and restore the surface as protection. These waxes always move to an outside surface and do not migrate to the inside surface between the two belt plies because of internal pressure that prevents the wax from going in that direction.[9] Based on his review of depositions and affidavits in this case, in particular statements by Jean Hoffman, Cooper's chief chemist, and Richard Angell, a former bias cut operator, Mr. Grogan formed an opinion that the belt-belt separation was a result of wax contamination in the factory.

In conducting the tire examination, Mr. Grogan made an investigation which eliminated other causation for the tire failure, including impact damage or a nail hole. Mr. Grogan explained that nail puncture is a very common reason for a tire to fail. Using a microscope, Mr.Grogan had observed an imprint of the head of a nail hole in the rubber. In his opinion, the nail hole had no significance at all to the failure. He formed this opinion based on observing no signs of distress where the sidewall and rigid area underneath the tread, the thinnest part of a tire and where a tire collapses when it goes flat. He also observed that the tire was a tubeless tire, whose innerliner sealed the nail in the tire very effectively because of compression forces. Based on his examination, he determined that certain damage marks on the tread indicated that the nail came loose from the tread when it began to separate. In his

9. Jean Hoffman, Cooper Tire's chief chemist in the Texarkana plant where the tire was manufactured in 1994, testified that microcrystalline or paraffinic waxes are used at the plant and serve as an antioxidant/antiozonant in the compounds. Ms. Hoffman stated that their purpose is to migrate through the compound and to protect the tire from the elements and to prevent the rubber from cracking that may occur due to oxidation or ozone. She agreed that they add a blend of microcrystalline and paraffinic waxes to the tread compound and the sidewall compound. In 1994, the Texarkana plant did not add those antiozonants to the skim stock compound. Ms.Hoffman stated, however, that these waxes are a constituent of compounds that contain a processing oil that help in the mixing and milling operation. Once the components are put together in the tire, those materials migrate and get into other compounds. It was no surprise to Ms. Hoffman that the RAPRA report found wax on the belt/skim compound because, contrary to Mr. Grogan, she believed it would be very common for the wax to migrate from the tread or the sidewall into the belt/skim compound.

experience, nails do not cause tread separations.

Mr. Grogan also determined that the tire had not been run flat, soft, or underinflated. He based his opinion on the following observations: (1) there was no removal of paint from inside of the tire, which starts to break away when there is a lot of flexing in the area where the tread and sidewall meet; (2) there were no signs of rubber wrinkling or chafing in that area, which would be caused by the cords beginning to pull through the rubber; (3) there was no sign of bead grooving, a line of quickly forming damage where the flange of the wheel contacts the tire and there is movement between the two, which indicated that the tire did not run flat or even soft; (4) measurements of tread depth indicated the tire tread was a little bit more than half worn, but was a perfectly usable tire in terms of tread depth; (5) there was no sign of polishing from the rim; (6) no markings to indicate that the user had run the tire at low pressures; (7) there were no broken cords, which would have indicated structural impact that weakened the tire; and (8) there was no rust on the tire and it had not been used beyond its legal limit. Mr. Grogan also ruled out overloading of the tire because he observed no sign of bead grooving whatsoever in the tire and no signs of stress inside.

On appeal, Cooper Tire argues that Mr. Grogan's opinions lacked a reliable scientific or factual basis. Specifically, Cooper Tire argues that his opinion on the role wax played in the belt separation had no scientific foundation because he did no testing to determine if wax on the surface of belt skim stock affected adhesion after vulcanization and did no testing to reveal the effect, if any, wax has on belt adhesion. Further, Cooper Tire asserts that Mr. Grogan's opinions on liner marks have not been validated by testing and are entirely subjective. Cooper Tire claims Mr. Grogan failed to provide a scientific basis for eliminating the puncture as a cause of the separation. Cooper Tire also contends that the RAPRA report upon which Mr. Grogan based his opinion was inadmissible as was Mr. Angell's testimony concerning wax and that neither support his opinions.

After reviewing Mr. Grogan's testimony, we find that his opinions were reliable pursuant to Rule 702. Mr. Grogan provided thorough information concerning his methodology and it is clear that his expertise rested on his many years of experience in tire examination for Dunlop and as an independent tire failure analyst. His preliminary opinion was based on his observations and analysis of the tire itself and he determined that the belt separation was caused by poor adhesion between the rubber component layers. Upon further investigation, Mr. Grogan had his conclusion confirmed by the RAPRA report, which identified the presence of wax in tested areas of the tire.

 Cooper Tire asserts that the RAPRA report was inadmissible hearsay and objected to its admission into evidence because it could not be authenticated and was hearsay. However, experts may testify on the basis of facts or data that need not be admissible in evidence if they are "of a type reasonably relied upon by experts in the particular field in forming opinion or inferences upon the subject...." *See* TEX.R.EVID. 703; *see also* TEX.R.EVID. 705 (expert may disclose underlying facts or data on direct examination). Here, Mr. Grogan testified that RAPRA was a firm of rubber specialists and chemists who used sophisticated techniques, were highly competent, and widely used by experts. He relied on their technical report to confirm his opinion concerning lack of adhesion during manufacturing of the tire.

■ Cooper Tire also asserts that Mr. Grogan's opinions lack a factual basis because he relied on deposition testimony from Mr. Angell, which should have been excluded. Mr. Angell, a former Cooper Tire employee, testified that when he worked as a bias cutter at Cooper Tire, he used a substance that felt, looked, and acted like wax during the tire-making process. In his deposition testimony, Mr. Angell stated that excessive waxes were put on the metal splices of the bias cutters to prevent jams, but wax would appear on the bottom side of the cord plies. Mr. Angell believed that the substance was paraffin-based wax. The waxes were used on the blade, on the foot, on the conveyor belts, on the rollers, and on the splicing table or the slide table. Mr. Angell repeatedly referred to the substance as wax, but the following exchange suggests his testimony may have been inconsistent:

Q. And when we are talking about wax, what we are really talking about is white-inside-of-a-Dixie-cup looking things, aren't we?

A. Yes, sir.

Q. That were made out there in the cement house?

A. Yes, sir.

Q. Stearic acid?

A. I have seen it all colors, yes sir. I guess it is stearic acid. I don't know what stearic acid is.

Q. Okay. You don't know what it was exactly?

A. No, sir.

Q. It is just something that the—you were given to work with?

A. Yes, sir. It looks—feels like wax, looks like wax, acts like wax, and they call it wax.

Q. Who calls its wax?

A. That's the word the first time I was ever handed some.

Mr. Grogan had also read deposition testimony by Ms. Hoffman. He recalled that she stated that waxes were applied to the making drum, the guillotine blade that cuts the belt material, and the guidance rollers. In his opinion, Mr. Angell's testimony simply confirmed what Ms. Hoffman said about use of wax on the blade and the guidance rollers. On direct examination, Ms. Hoffman testified that the Cooper Tire plant receives stearic acid from a vendor, which is melted down and put into paper cups. She stated that in 1994, stearic acid, not wax, was used to lubricate the machines, but a lot of people in the plant called it wax. Ms. Hoffman also stated that wax would not have been used on the bias cutters because it is not a very good lubricant. Mr. Angell and Ms. Hoffman offered conflicting testimony, which turned on witness credibility and evaluation of the weight of the evidence. We conclude the trial court did not err in admitting Mr. Angell's testimony and note that Mr. Grogan did not rely solely on Mr. Angell's testimony as the factual basis for his conclusions. Further, we conclude the trial court reasonably found Mr. Grogan's testimony to have a reliable basis and overrule Cooper Tire's challenge to this witness.

### Dr. Alan Milner's Testimony

Next, Cooper Tire argues that the trial court erred in admitting expert testimony from Dr. Alan Milner. Cooper Tire asserts that Dr. Milner was not qualified to testify about manufacturing defects in tires, the effect of punctures on tires, or tire failure and his opinions lacked a reliable, scientific, or factual basis. We disagree.

■ Dr. Milner is a professional engineer who has specialized since 1974 in failure analysis and accident investigation involving metallurgical, mechanical, automotive, and combustion engineering. Dr.

Milner was educated in the United Kingdom and received his bachelor's degree in metallurgical engineering, which is now called material science, from the University of Sheffield. Metallurgical engineering includes the study of failure analysis and is concerned with the application of the principles of physics, mathematics, mechanical engineering, thermodynamics, and chemistry to the manufacture of metals into forms and products and the evaluation and testing of such products and structures. After receiving his bachelor's degree, Dr. Milner was employed by a large aircraft manufacturing company in an apprenticeship in different areas of aircraft manufacturing. He then worked at General Electric Company in the nuclear power industry, where he conducted predictive failure analysis involving steel structures, pressure vessels, and structures used in nuclear energy and electric generating plants. At the same time, Dr. Milner attended the University of London and was awarded a master of science degree in engineering.

In 1964, Dr. Milner received his Ph.D. in metallurgy and materials from the University of Manchester and was also a research associate during his studies there. The subject of his dissertation involved the bonding of materials and combining the properties of metals and metals in a single material that would have special properties. From 1964 to 1970, Dr. Milner worked for Minnesota Mining and Manufacturing Company ("3M Company") on federal defense research contracts involving the fabrication of metals, troubleshooting, and failure analysis. In 1970, Dr. Milner became an Associate Professor of Metallurgical Engineering at the University of Arizona.

He started his engineering consulting business in 1974, which consists in product failure analysis. In particular, Dr. Milner

conducts non-destructive testing, x-ray examination, and microscopy—techniques used in failure analysis to evaluate why products fail. Dr. Milner is a licensed professional engineer and is a member of various organizations, including the American Society for Metals, the Society of Automotive Engineers, and the Systems Safety Society. He is also a member of Wire Association International in connection with his work on steel cords that are used as structural materials in tires.

Dr. Milner testified that he has been doing failure analysis on tires for over twenty-six years. He explained that tires represent composite materials, combinations of steel and other materials such as tire rubber, and involve technologies which are based in materials science. Dr. Milner stated that tire technology is based on metallurgy, the chemistry of metals and metal rubber systems. As a result, he has done a great deal of work on the failure of tire beads, steel wired structures that retain the tire on to the wheel, and tread separations in steel belt radial tires. Dr. Milner explained that steel belt structures, which are composites of steel wire, have metallurgical technologies involved in them such as electroplating and diffusion processes, which are used to bond them together.

Cooper Tire's complaints are primarily directed at Dr. Milner's lack of a formal education in tire design or manufacture and his lack of real world experience with building a tire or performing tire testing for a federal agency. Cooper Tire also asserts that Dr. Milner's research work and experience had nothing to do with tires or rubber. After reviewing Dr. Milner's testimony and evidence of his qualifications, it is clear that Dr. Milner's education, training, and experience qualified him to render opinions in tire failure anal-

ysis, a subject within his area of specialized knowledge.

■ Cooper Tire also challenges the reliability of Dr. Milner's opinions. At trial, Dr. Milner explained his methodology in conducting a failure analysis. When conducting an tire examination for forensic science purposes, it is generally accepted that the examination must be nondestructive. First, Dr. Milner tries to obtain as many pieces of the failed tire as are available. He then starts nondestructive testing by identifying the type of product and the manufacturer. If there are fragments, as was the case with this particular tire, Dr. Milner examines the pieces to determine whether they are, in fact, from the tire. Dr. Milner then fits the fragments together and indexes the pieces of the transferences with the body or carcass of the tire. Dr. Milner stated that there are certain characteristic failure modes, that is, ways in which the product fails that are characteristic of the product. In steel-belted radial tires, there are two characteristic modes of failure:(1) belt-belt separation or tread separation, which usually starts at the edges of the steel belts and progresses circumferentially and across the tire, culminating in the tread coming off due to centrifugal force; and (2) the possibility that the tire may have been underinflated during operation, in which case the sidewall will fail, rather than the tire tread coming off. If it were a case of sidewall failure, Dr. Milner would not pursue the matter further because the reasons for the failure are generally outside the scope of the manufacturer's responsibility.

Dr. Milner's protocol started with an examination of the pneumatic sealing condition of the tire.Dr. Milner examines the pressure vessel for indications that it has lost air during its service life or has become damaged as a result of underinflation. In determining air retention, Dr. Milner considers the presence of punctures and examines the beads of the tire, which in a tubeless tire constitute the seal between the wheel and the tire, to see the beads have been compromised or damaged. Dr. Milner then examines the innerliner of the tubeless tire, the sealing membrane on the interior surface of the tire. In particular, he checks for any discontinuity or damage in the interior sealing surface. Dr. Milner also looks for evidence of underinflation in the past by examining for damage, or polish, where the lower sidewall of the tire and the wheel flange come into contact.

After examining the sealing aspects of the tire, Dr. Milner next conducted a visual inspection of the fracture surface where the tread and steel belt separated from the inner.[10] In this case, his inspection revealed that the separation was predominately between the inner and outer steel belts. He observed extensive belt edge separation around the circumference of the tire shoulders on both sides. The fracture structure indicated that a large section had peeled off in a single revolution while there were some marks that suggested another section came off after successive turns and had the greatest difficulty separating. Specifically, Dr. Milner testified that there were a number of fracture lines at the end of the tread fragment that represent successive turn revolutions of the wheel as the tread was peeling off. However, in the extended area, there were none of the marks that represent tire wheel rotation. Therefore, he concluded that the extended

10. With respect to the tread itself, Dr. Milner observed that the outer belt separated from the inner belt and in one area the outer belt was partially detached from the underside of the tread, making the inner side and outer side of the outer belt observable for inspection. Dr. Milner microscopically examined both sides.

area came off in a single revolution. The puncture wound in the tire was in the same general area as the section that had the greatest difficulty separating.

In photograph enlargements of the separation surface, Dr. Milner observed fracture lines, or cracking marks, in the immediate vicinity of the puncture, which indicated that there was nothing in that area that represented an initiation of the crack. Other areas on the surface were smooth due to treading against the tire carcass, but in the puncture area, the cracking marks were sharp and unpolished, which indicated the separation surface was the result of tearing rather than the result of tire damage associated with the puncture. Dr. Milner concluded that the fracture that caused the tire to separate did not initiate in the puncture location because the area was characterized by tearing around it and not a polished surface, which indicates a growing separation that rubs against the other part of the carcass.

Beyond his visual inspection of the tire, Dr. Milner did some further nondestructive testing on the tread fragment and did an x-ray examination of the full circumference of the tire carcass. He explained that the purpose of taking an x-ray of the tire was to inspect the arrangement of fine steel cables embedded in the rubber to see if there are any irregularities in the steel belt structure or damage to it. Dr. Milner observed a very small entry hole on the tread, which was characteristic of a nail. It was associated with some disruption of the tread, with damage to one steel cord and a slight perforation in the innerliner, but Dr. Milner believed the damage was very localized. Dr. Milner further examined the nail hole in the belts through micro lens photography. The photographs showed damage caused by a penetrating object, indicated that the object was small in diameter, and that there was no deviation between the parallel lines of the steel wire's normal position. In sum, Dr. Milner saw very little distortion due to the very small penetrating object.

Dr. Milner also considered how well this tubeless tire sealed the puncture as it is designed to do. He saw no evidence that the nail caused defamation in the permanent bending in the cord structure. Dr. Milner also inspected the wires with a microscope and observed no polishing, which would have indicated that the nail was wiggling about and as a result burnishing the wires with which it came into contact.[11] In Dr. Milner's opinion, the nail had nothing to do with the belt tread separating.

Based on his x-ray work, microscopic examinations, and physical inspection of the tire, Dr. Milner also concluded that the tire had not been operated in an underinflated condition. He found no evidence to suggest underinflation during his visual inspection of the sealing surfaces. The sealing characteristics of the beads were normal, were all in very good condition and there was no fabric exposed, which is significant to their inability to seal. The innerliner was not irregular, except for the small puncture hole. Dr. Milner also observed no exaggerated marks in the contact line between the rim flange and the bead area, which would have indicated the tire was run overdeflected in an underinf-

11. Upon inspection with a microscope, Dr. Milner determined that the penetrating object came from the outside inwards, with the innermost part showing rust on the brassy wires caused by the environment. The underside of the outer belt, however, showed no rust. Based on his observations, Dr. Milner concluded that the punctured object was well-sealed, because if it had not been, outside moisture would have caused the broken wire to rust.

lated manner. He did observe very light polish and no real groove, which meant very light use of the tires.

Based on his examinations, Dr. Milner concluded that the tire developed belt edge separation early in its life and that the separation began at the cut edges of the steel belts and progressed circumferentially around both shoulders of the tire, which was evidenced by polishing. Dr. Milner stated that the separation extended further than one would expect "as a result of poor adhesion that existed between the inner and outer steel belt." By examining the fracture surface, the surface of separation, Dr. Milner ascertained the characteristics of the manner in which it separated. He determined that it separated very readily which according to Dr. Milner is a characteristic of poor adhesion. Dr. Milner explained to the jury that centrifugal force tends to throw the belt off, but it is retained by its adhesion to the other belt. In this case, as the separation of the belt edges progressed, it reached the point where it could peel off readily. The surface indicated to Dr. Milner that there were extended areas of it which were never bonded initially when it was made and the tread separated at those areas.

On appeal, Cooper Tire argues that Dr. Milner's opinions lacked a reliable foundation because he alleged an adhesion defect in the tire caused the separation, but never obtained rubber samples and did not conduct any adhesion testing. After reviewing Dr. Milner's testimony, we conclude that the trial court did not err in finding Dr. Milner's opinions to be based on a reliable foundation. Dr. Milner provided great detail concerning his methodology and procedure in tire examination. He also applied his experiential knowledge in failure analysis in determining the cause of the tread separation and in eliminating other potential causes.

### Jon Crate's Testimony

■■ Cooper Tire also challenges the admissibility of expert testimony from Jon Crate. Specifically, Cooper Tire asserts that Mr. Crate was not qualified to testify as an expert in this case. Since Mr. Crate has not performed tire failure analysis outside the litigation process, is not a expert in tire design, tire manufacturing, or forensic tire examination, Cooper Tire asserts he was unqualified to render his opinions, which lacked scientific and objective support.

Mr. Crate is a researcher at the Georgia Tech Research Institute. He holds a bachelor's degree in chemistry and a master's degree in polymer science and engineering. Mr. Crate spent two or so years working towards a Ph.D. in molecular cell biology, but did not receive that degree. He then spent two years doing research in molecular biology and biochemistry at the University of Alabama in Birmingham. In 1991, Mr. Crate was an analytical chemist for Applied Technical Services for seven and half years. His field of specialty is chemical analysis of polymers and foreign substances and failure analysis of polymers. Polymers as a group include all plastics, rubbers, coatings, paints, and composite made between different materials. For the past ten years, Mr. Crate has been doing chemical analysis of polymers, identification of foreign substances, and failure analysis of products made out of plastic and rubber composites.

In this case, he was retained for the purpose of interpreting the RAPRA report results. Mr. Crate stated that RAPRA conducted two types of chemical tests, infrared spectroscopy and gas chromatography/mass spectroscopy. Since 1991, Mr. Crate has done such testing and interpreting of the results of testing on a weekly basis. In connection with his work at

Georgia Tech, he has used three different infrared spectrometers to perform such tests. In the last two years, Mr. Crate has interpreted these types of tests and done analysis on seven tires. Mr. Crate did not consider himself an expert in tire design, tire manufacturing, or forensic tire examination. He is not a professional licensed engineer and has not published anywhere.

In this case, Mr. Crate reviewed a copy of the RAPRA report, in particular the spectra presented as part of the report. Mr. Crate examined the spectra and compared it with known standard spectra from standard reference materials. Mr. Crate reached several conclusions as a result of his analysis of the data. Mr. Crate stated that RAPRA report concluded that the infrared spectra and the GC/MS data indicated the presence of paraffin wax in tested areas and he agreed with that conclusion. Mr. Crate explained that paraffin wax has identifying characteristics and the two techniques used by RAPRA were appropriate for identifying that chemical.

The report also concluded that there was no evidence of stearic acid present. In his analysis, Mr. Crate obtained infrared spectra for paraffin wax and stearic acid. Based on his review of Jean Hoffman's testimony, Mr. Crate knew that she claimed they did not use paraffin wax to lubricate machinery as Mr. Angell had indicated in his deposition testimony. Rather, she claimed the plant used stearic acid. The eight infrared spectra in the RAPRA report taken from samples of the underside of the belt that separated showed zero indication of stearic acid.

Mr. Crate examined RAPRA's infrared spectra and noticed that they found wax on the outer surface, but none on the cut face, that is, the bottom side of the tire tread. For Mr. Crate, the significance of this finding was that wax is incorporated into some tire components, but not others, and it is important in protecting the tread and sidewall against oxidation, UV degradation, and ozone degradation. Mr. Crate knew that wax was a component based on recipes he has seen in the Vanderbilt Handbook, the Rubber Formulary, and deposition testimony from Jerry Leyden, who confirmed that wax is used in the tread stock, in the sidewall, but not in the belt stock. In all the recipes, Mr. Crate has seen the wax found on the fracture site of this particular tire was not a part of the belt stock recipe. Mr. Crate opined that wax inhibits the adhesion to the steel.

Mr. Crate was also aware of the contention that this particular wax migrated or moved from the tread and sidewalls in between the two belts. Mr. Crate agreed that wax, in fact, can migrate and that there are forces especially in a new tire that cause it to bloom to the surface. After reviewing four research articles, including "Quantitative Patterns of Blooming of Ozone–Protective Waxes in Tire Vulcanisates" and "Migration and Blooming of Waxes to the Surface of Rubber Vulcanizates," Mr. Crate determined that it was not possible for the wax to bloom on the surface. From these studies, Mr. Crate concluded that it is well-known that paraffin waxes are capable of migrating to the surface by something called "blooming." Mr. Crate also learned from the articles that: (1) wax is readily soluble in rubber during the hot mixing and curing processes; (2) waxes are insoluble or have very low solubility in rubber at room temperature; (3) once rubber has cooled back down, it crystallizes out and wax is not readily soluble in the rubber itself—this insolubility is the driving force causing blooming; (4) the rate of blooming over time drops off sharply once the wax is no longer supersaturated; (5) how long it takes to reach that plateau depends on the temperature, the concentration of wax, the

type of rubber, the fillers used, the thickness of the rubber, and the molecular weight of the wax; (6) some waxes have a higher melting temperature and such waxes have a higher molecular weight; and (7) the length of the straight chain hydrocarbons in the wax affects the rate of migration and short chains will migrate quicker than long chains.

After reviewing the testing done by RAPRA, deposition testimony, and the above factors, Mr. Crate concluded that wax would not be expected on the fracture surface of the belt skim stock. Mr. Crate was convinced that it came in during the manufacturing process, rather than coming from the tire and through the skim stock. Mr. Crate had five bases for concluding that the wax was a foreign substance and not part of the skim stock. First, the Vanderbilt Handbook and the Rubber Formulary all show waxes in tread stock, but not in the belt skim stock. Second, deposition testimony confirmed that Cooper Tire and common industry practice is not to include wax in belt skim stocks. Third, Mr. Angell's deposition testimony indicated that Cooper Tire used paraffin wax to lubricate the bias cutters. Fourth, RAPRA reported data that wax was found on the fracture surface, but not on the cut faces and that the molecular weight distribution was not changed between what is used in the tread and what is found on the fracture surface. Fifth, diffusion through a belt skim stock, based on the research articles factors, would be limited by the solubility.

Having reviewed Mr. Crate's testimony, we find that the trial court reasonably concluded that Mr. Crate was qualified to render the opinions he made in this case. Mr. Crate demonstrated that he had specialized knowledge in chemical analysis, identification of polymer materials, and

was familiar with technologies used in related testing. Mr. Crate explained his methodology in analyzing data from the RAPRA report and the research materials that informed his opinions in this case.

### Sufficiency of the Evidence

Viewing the evidence in a light favorable to the verdict, we conclude that there is more than a scintilla of evidence to support the jury's finding of a manufacturing defect. After reviewing all the evidence, we also conclude that the jury's finding is not so contrary to the overwhelming weight of the evidence as to be clearly wrong and manifestly unjust. Issue One is overruled in its entirety.

### CAUSATION

#### Sole Causation Theory

In Issue Eight, Cooper Tire argues the trial court committed reversible error by excluding evidence of sole cause and by refusing to submit a sole cause instruction in its charge to the jury. At trial, Cooper Tire sought to introduce evidence that the minivan had a greater propensity to roll over because of the weight of the six passengers shifting to one side and that if everyone had been belted, Mr. Mendez would have controlled the vehicle. Juan Herrera, an expert for Cooper Tire, opined in a bill of exception that the passengers' unrestrained condition caused the minivan's trip and roll. Based on Mr. Herrera's calculations, the van would not have tripped and rolled if all seven occupants had been wearing seat belts. Further, Mr. Herrera concluded that if the minivan had not tripped and rolled, the ejected passengers would not have sustained such serious injuries. Cooper Tire argues that this evidence was critical to its sole cause de-

fense.[12] However, we find that the trial court did not abuse its discretion in its ruling and refusal to submit the requested jury instruction because Cooper Tire's sole causation defense turned on evidence which at the time of trial was inadmissible under the governing statute.

■■■■■ Each party is entitled to submission of all of his theories if they have support in the evidence. *Rankin v. Atwood Vacuum Mach. Co.*, 831 S.W.2d 463, 465 (Tex.App.-Houston [14th Dist.] ), *writ denied, per curiam*, 841 S.W.2d 856 (Tex. 1992). Sole proximate cause is an inferential rebuttal issue, which may be included in the jury instructions at the trial court's discretion. *Id.* at 465; *see also* TEX. R.CIV.P. 277. Sole proximate cause applies to the conduct of others not a party to the suit. *Rankin*, 831 S.W.2d at 465; *see also Montes v. Pendergrass*, 61 S.W.3d 505, 508 (Tex.App.-San Antonio 2001, no pet.)(sole proximate cause application limited to circumstances in which evidence shows that a third person's conduct, not the conduct of any of the parties to the lawsuit, is the sole proximate cause of the occurrence). In this case, Cooper Tire's theory rested on the combined weight of the unbelted occupants, but three of the six occupants not wearing seat belts are parties to this suit. Therefore, the trial court did not err in refusing Cooper Tire's instruction.

Moreover, at the time of trial, the Transportation Code provided that the "[u]se or nonuse of a safety belt is not admissible evidence in a civil trial, other than a proceeding under Subtitle A or B, Title 5, Family Code." TEX.TRANSP. CODE ANN. § 545.413(g)(Vernon 1999), repealed by Acts of 2003, 78th, R.S., ch. 204, § 8.01, 2003 Tex.Gen.Laws 847, 863. In *Carnation Co. v. Wong*, the Texas Supreme Court held that the plaintiffs "should not have the damages awarded to them reduced or mitigated because of their failure to wear available seat belts." *Carnation Co. v. Wong*, 516 S.W.2d 116, 117 (Tex.1974)(per curiam). In *Pool v. Ford Motor Co.*, the Court reaffirmed that holding and noted that the legislature had simply ratified Carnation's policy for future cases. *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 633 (Tex.1986)(discussing Tex.Rev. Civ.Stat. Ann. art. 6701d, § 107C(j), former version of Section 545.413(g)); *see also Bridgestone/Firestone, Inc. v. Glyn– Jones*, 878 S.W.2d 132, 134 (Tex.1994)(Subsection (j), in Section 107C was included to make it clear that the sole legal sanction for the failure to wear a seat belt is the criminal penalty provided by the statute and that the failure could not be used against the injured person in a civil trial). Based on the statute in effect at trial, we conclude the trial court did not abuse its discretion in excluding Cooper Tire's sole causation evidence.[13] Issue Eight is overruled.

### *Expert Witnesses on Causation*

In Issue Six, Cooper Tire argues that the trial court erred in admitting expert testimony on causation from Stephen Arndt and Curtis Flynn. We review this

---

**12.** Cooper Tire also made a bill of exceptions during Mr. Mendez's testimony. Mr. Mendez testified that he only put on his seat belt while driving because there were police on the highway. Mr. Mendez was aware that the other passengers were not wearing their seat belts.

**13.** We observe that Cooper Tire suggests in its brief that Section 545.413(g) violates its due

process rights under the federal and Texas constitutions, however, Cooper Tire provides no argument in support of this contention. We find that Cooper Tire has failed to adequately brief this issue and we do not reach its purported constitutional challenge in this opinion. *See* TEX.R.APP.P. 38.1(h).

issue under the standard of review for admission of expert testimony as previously set out in our discussion of Issue One.

## Stephen Arndt's Testimony

Cooper Tire does not challenge Stephen Arndt's qualification as an expert witness. Rather, Cooper Tire asserts that Mr. Arndt's opinions were unreliable and lacked a scientific or factual basis. Mr. Arndt has a background in engineering and owns a company that consults with the legal community on automotive crash safety issues. In this case, Mr. Arndt investigated this particular accident and inspected the accident vehicle and tire to understand how the tire tread separation related to vehicle handling. In so doing, Mr. Arndt utilized testing he had done and relied on his experience in his specialty field. His investigation involved reviewing materials such as the police report, police photographs of the accident scene, the accident vehicle, the tire, reviewing witness statements, and depositions of fact witnesses.

Mr. Arndt inspected the accident vehicle with particular attention to the left rear wheel position where the tire tread came off of the tire. Based on his examination of the vehicle and other documentation related to this case, Mr. Arndt concluded that physical evidence on the vehicle showed that the initial tread separation interacted with the wheel well and some of the structures within the vehicle. Mr. Arndt opined that this interaction with the wheel well caused a dragging and pulling of the vehicle to that side, meaning the left rear separation pulled the vehicle to the left. This conclusion corresponded to testing Mr. Arndt has done in this area that demonstrated that a vehicle will initially pull to

the left. Mr. Arndt also stated that physical evidence on the roadway showed tire marking going from left to right.

Mr. Arndt believed that a steer back to the right had to have occurred to redirect the vehicle in that direction. He explained that with the tire tread gone from the vehicle at the left rear wheel position, the tire did not have the same frictional capacities or cornering capacities as a tire with tread. Under these circumstances, the vehicle behaves very differently; if one steers it to the right, it will oversteer, which is a vehicle characteristic in this condition. According to Mr. Arndt, in the first event, there was not much steering input by the driver that caused the vehicle to go to the right after it initially started to the left because the vehicle would have spun out.[14] The driver countersteered back to the left and the vehicle came back in a counterclockwise rotation and then tripped and rolled over. After the driver steered back to the left, he lost control of the vehicle since at that point all the tires were saturated, meaning they lost their friction capability and were sliding. In Mr. Arndt's opinion, the tread separation in the left rear caused the accident in this case.

Mr. Arndt explained to the jury his testing procedures and the evidence of tire tread transfer markings on the vehicle, which formed the basis for his opinion on how the separation caused the accident. In this case, the tire tread started peeling off progressively from one side and as that occurred, it flapped around within the wheel well area. This created a drag effect and pulling of the vehicle to the left. This occurrence makes a very loud noise as the tread beats against various compo-

---

14. Mr. Arndt could not determine the degree of steer back to the left, but believed it was not a large steer, that is, forty-five degrees or more because that would have led to the vehicle spinning out.

nents of the vehicle and interacts with the ground. Mr. Arndt has done actual vehicle testing of a sport utility vehicle that showed the various effects of a tread separation on the handling characteristic of a motor vehicle. He has also conducted tread failure simulation testing to evaluate how a vehicle behaves as the tire tread is coming off the vehicle. In this open loop testing, the driver was instructed to hold the steering wheel straight in order to observe how the vehicle responded. In these tests, the right rear tire was modified to fail by cutting in between the steel belts or scoring the tire at an angle. The vehicle was instrumented and the data recorded was then analyzed. Based on the empirical testing, Mr. Arndt concluded that "as the tread comes off, the vehicle will pull to the side that the tread comes off." Next, Mr. Arndt ran a series of tests and then analyzed how the vehicle would behave once the tread was gone. Mr. Arndt removed the outer steel belt to replicate the belt separation in this case. This testing showed that the vehicle with one tire tread separated behaved completely different from the vehicle with four good tires and showed oversteering characteristics and quickly ended up spinning out.

According to Mr. Arndt, if the driver did not steer the vehicle in this accident, he would have gone off the left in the center median and perhaps had some other accident. Despite Mr. Mendez's testimony that he never steered to the right, Mr. Arndt believed he must have steered to the right because physics did not support Mr. Mendez's recollection. Likewise, physics did not support Mr. Mendez's testimony that there was no pull to the left nor did it support Mr. Gonzales's statement that the vehicle moved immediately to the right, not to the left.

On appeal, Cooper Tire argues that Mr. Arndt's opinions were unreliable because his testing was done with vehicles other than a Mazda minivan. At trial, Mr. Arndt testified that the oversteering characteristics he observed in testing happened across the spectrum of vehicles. Mr. Arndt stated that with regard to tread separation, a minivan is going to do the same thing and would be very similar to the sport utility vehicle used in the testing.

Cooper Tire also asserts that his opinions lacked a reliable scientific or factual basis because his opinion was contrary to witness testimony. Review of Mr. Arndt's testimony shows that he was aware of witness testimony and expressly disagreed with their recollection of events. Mr. Arndt instead formed his opinions based on test data and physical evidence of the scene and on the vehicle. We conclude that the trial court did not err in admitting Mr. Arndt's testimony.

### Curtis Flynn's Testimony

 Within Issue Six, Cooper Tire also asserts that Curtis Flynn's opinion on how a vehicle reacts to a tread-belt separation was inadmissible because he was not qualified to render the opinion and it amounted to inadmissible speculation. We disagree.

Curtis Flynn is a former El Paso police officer. After graduating from the academy in 1975, he was assigned to the traffic division and his primary function was motor vehicle accident investigation. Mr. Flynn was later promoted to detective and assigned to the criminalistics unit, followed by an assignment to the homicide unit. Since leaving the police department, Mr. Flynn has been employed as an accident reconstructionist in the field of motor vehicle accidents. His qualifications in accident investigation and accident reconstruction include investigation of over 5,000 traffic accidents as a police officer and

advanced training in motor vehicle accident reconstruction. Mr. Flynn was also an instructor with the El Paso Police Department for the field advanced accidents investigation.

Mr. Flynn explained that the function of an accident reconstructionist is to take data and information collected in accident investigation and interpret that information and physical evidence through analysis to determine facts such as how fast vehicles were traveling, what direction they were traveling, and the drivers' and passengers' actions. In this case, Mr. Flynn examined physical evidence at the accident scene, including gouge marks, tire marks, and debris. He also reviewed witness statements, interviewed the investigating officer, read depositions of the parties and witnesses involved in the accident, and saw the subject tire.

From his scaled depiction of the physical evidence that remained at the accident scene, Mr. Flynn determined that vehicle made a hard right-hand turn and as it did this, the left rear tire started to mark the roadway and the vehicle started to slide sideways while still moving forward. At some point, the vehicle was steered back to the left in an attempt to correct the path of travel back on to the roadway. When the driver steered to the left, the right side tire marked the roadway. At that point, the rear end of the vehicle was swinging out to the side and was in the beginning phase of the roll over. There were gouge marks in the asphalt where the right front and rear wheels of the minivan began to trip or flip into the air. When the vehicle progressed in the roll and continued to roll, it left identifiable marks in the road surface. In terms of his qualifications to determine what caused the vehicle to roll in the manner it did, Mr. Flynn stated that in his accident reconstruction training and experience, one of the predominant aspects

is the dynamics of a vehicle, that is, what happens to vehicles during the course of an accident and what causes vehicles to act in certain ways.

At trial, Cooper Tire objected to Mr. Flynn's qualifications to render an opinion on how a vehicle reacts following a tread belt separation. Outside the jury's presence, the trial court conducted a *Daubert* hearing on this matter. In voir dire, Mr. Flynn testified that an integral part of accident reconstruction is looking at the dynamics of the vehicle and how the tires interact with the road and the vehicle itself. Mr. Flynn stated that he has been involved in various testing in which they applied brake applications to individual wheels and found that if there was a deceleration on that side of the vehicle at the left rear tire, the vehicle will pull to the left. This testing was not specific to a tire blowout, but Mr. Flynn believed that the deceleration was just achieved by different means in his testing. In the jury's presence, Mr. Flynn testified that the physical evidence showed that the left rear tire totally separated from the vehicle and this caused a deceleration at the left rear portion of the vehicle. He stated that based on testing he has done, when this occurs, a vehicle will pull to the left.

In its brief, Cooper Tire points out that Mr. Flynn in voir dire could not recall the authors of articles he reviewed, when the articles were published, or whether the articles were peer-reviewed. Cooper Tire also notes that Mr. Flynn admitted he was not a tire failure analyst, that he did no studies to determine the effects of a blowout versus a tire separation, and that his studies did not involve tire disablements. After reviewing Mr. Flynn's testimony, it is clear that he had at least the minimum requisite qualifications to render his opinion on deceleration. His testimony on the matter was based on testing, which he

believed was applicable despite the different cause of the deceleration in this particular case.

We conclude the trial court did not abuse its discretion in admitting Mr. Arndt's testimony and Mr. Flynn's testimony. Accordingly, Issue Six is overruled.

## EVIDENCE OF OTHER LAWSUITS

■ In Issue Seven, Cooper Tire contends the trial court erred in allowing the Plaintiffs to introduce evidence of other incidents and lawsuits. We review Cooper Tire's evidentiary challenge for an abuse of discretion. *See City of Brownsville v. Alvarado*, 897 S.W.2d 750, 753 (Tex.1995).

Cooper Tire complains that over its objection, the Plaintiffs were permitted to elicit testimony about other incidents and lawsuits from several defense witnesses. In response, the Plaintiffs argue that the trial court properly admitted evidence of other lawsuits and incidents for purposes of impeachment or to show bias. We agree.

Rule 613(b) permits impeachment of a witness by proof of circumstances or statements showing his or her bias or interest. *See* Tex.R.Evid. 613(b). In *Russell v. Young*, 452 S.W.2d 434 (Tex.1970), the Texas Supreme Court recognized that under the well-established law governing cross-examination, an expert witness may be cross-examined regarding the number of times he has testified in lawsuits, payments for such testifying, and related questions. *Russell*, 452 S.W.2d at 436.

Here, Lyle Campbell was questioned about his prior testifying experience. Mr. Campbell identified the case as Tuckier, but provided no details and did not mention the subject of the litigation. Anthony Brinkman was asked if he participated in the Tuckier trial and he replied no and

provided no details on Tuckier or any other lawsuit. Cooper Tire's expert Harold Herzlich was questioned about other lawsuits, but no details were provided. Jerry Leyden was questioned about testifying for tire manufacturers, but no details were provided from those incidents. Christopher Shapley was questioned about other Cooper Tire lawsuits in which he was involved and whether he had given similar testimony in an attempt to impeach Mr. Shapley's denial of a "longstanding relationship" with Cooper Tire.

The complained-of questioning was clearly for impeachment purposes to show interest or bias in the litigation. Under Rule 613(b) such questioning was permissible. Therefore, the trial court did not err in admitting this evidence. Issue Seven is overruled.

## IMPROPER JURY ARGUMENT

In Issue Four, Cooper Tire claims Plaintiffs' counsel repeatedly engaged in improper jury argument, in which counsel accused various witnesses of lying and appealed to the jury's ethnic and cultural heritage. Cooper Tire asserts that this argument was so prejudicial and inflammatory, it is entitled to a new trial, thus the trial court erred in denying its motion for new trial on this ground.

■ To obtain reversal of a judgment on the basis of improper jury argument, Cooper Tire must prove: (1) an error; (2) that was not invited or provoked; (3) that was preserved at trial by a proper objection, motion to instruct or motion for mistrial; and (4) was not curable by an instruction, a prompt withdrawal of the statement, or a reprimand by the trial court. *Standard Fire Ins. Co. v. Reese*, 584 S.W.2d 835, 839–40 (Tex.1979); *see also* TEX.R.CIV.P. 324.

■ In this case, Cooper Tire did not object to any of the Plaintiffs' counsel's statements complained-of on appeal. *See* Tex.R.App.P. 33.1(a)(1). However, an objection is not required to preserve error if the error is deemed to be incurable. *Otis Elevator Co. v. Wood,* 436 S.W.2d 324, 333 (Tex.1968). The test for incurable error is "whether the argument, considered in its proper setting, was reasonably calculated to cause such prejudice to the opposing litigant that a withdrawal by counsel or an instruction by the court, or both, could not eliminate the probability that it resulted in an improper verdict." *Tex. Employers' Ins. Ass'n v. Haywood,* 153 Tex. 242, 266 S.W.2d 856, 858 (1954); *see also Goswami v. Thetford,* 829 S.W.2d 317, 321 (Tex.App.-El Paso 1992, writ denied). Cooper Tire must prove that the probability that the improper jury argument caused harm is greater than the probability that the verdict was grounded upon the proceedings and the evidence. *Tex. Employers' Ins. Ass'n v. Guerrero,* 800 S.W.2d 859, 865 (Tex.App.-San Antonio 1990, writ denied).

■ Cooper Tire asserts that Plaintiffs' counsel repeatedly accused Cooper Tire and its witnesses of fabricating testimony and lying under oath. Cooper Tire directs our attention to numerous statements in the record, which after reviewing the context in which they were made, we do not support Cooper Tire's characterization. These complained-of statements are as follows: (1) that Jean Hoffman did "testify to things that may not be technically accurate and might be false;" (2) pointing out that Ms. Hoffman had not read articles that would have contradicted her testimony; (3) asking why Ms. Hoffman testified about a false possibility; (4) that Lyle Campbell "was not being truthful" about the existence or nonexistence of tapes of Cooper's manufacturing process; and (5) that Anthony Brinkman gave testimony that was "not truthful." Cooper Tire did not object to these statements, which appropriately can be regarded as challenges to the credibility of defense witnesses, which were supported by the evidence. None of these witnesses were condemned as liars, as manufacturers of evidence, or as persons testifying purely out of self-interest without regard for the truth, as Cooper Tire claims.

■ Cooper Tire also complains of jury argument in which Plaintiffs' counsel: (1) claimed Cooper Tire "bought" testimony from Deputy Sheriff Ventura Salas; (2) did not retain a certain tire analyst because that analyst "was not for sale;" and (3) argued Cooper's experts "have decided to take not the path of righteousness, but the path of the almighty dollar.... They have become the merchants of doom; the undertakers of Cooper Tire. They will bury anybody who stands in their way." Again, Cooper Tire did not object to these statements, but on appeal asserts that these arguments accused both Cooper Tire and its experts of perjury, manufacturing evidence, and disregarding the truth in exchange for financial gain. Cooper Tire also argues that several of these comments were prejudicial and inflammatory. After careful review, we find that these statements during Plaintiffs' counsel's argument could have easily been cured by an objection and instruction to the jury to disregard.

Cooper Tire also contends the following statements constituted improper jury argument: (1) accusing Cooper Tire of "using [its employees] to sell positions to [the jury] that simply are not true;" (2) stating that Cooper Tire employees engaged in a "conspiracy of silence" by declining to testify because "if they were to speak, they would have to not be truthful. If they went the other way, they'd be fired;" (3) calling Cooper Tire's experts "assassins of

truth;" (4) accusing Cooper Tire of "creat[ing] information" and "search[ing] for the testimony from the person who says what they want them to say;" (5) telling the jury not "to believe Cooper Tire and their fabrications;" and (6) stating that "[i]t's equally obvious that Cooper Tire doesn't care about the truth." While the above statements are troubling and warrant scrutiny on appeal, we do not believe that these arguments were so inflammatory, so harmful, or so prejudicial that an instruction to disregard would not have eliminated the probability that an improper verdict would be rendered. Moreover, viewed in light of the entire record, these arguments fail to establish that it was more probable that their impropriety caused harm than it is probable that the jury's verdict was based on proper proceedings and evidence.

▮ Finally, Cooper Tire asserts that Plaintiffs' counsel appealed to the jury's ethnicity and local prejudice. First, Cooper Tire complains of the following statement:

> [W]hen I heard you guys had menudo back there, I did want to go back in there with you. And it made it worse when the Chihuahua posole was brought. Now, that really made me jealous, because there's nothing like being authentic and being real. That's the kind of cooking that we get here in El Paso; good home cooking, authentic and real.

Cooper Tire did not object to counsel's comment on the jurors' breakfast. Cooper Tire also commented on the jurors having breakfast during its argument in this case. We also note that the trial judge commented on the jurors' menudo during the course of this lengthy trial. After reviewing the record, we find that Plaintiffs' counsel did not pander to ethnic unity, as Cooper Tire claims, nor was counsel asking the jury to decide the case based on local prejudice or ethnic identity by his menudo comment.

▮ Next, Cooper Tire complains of the following two statements:

> They have value—Cooper Tire has value, but you know what? People here in El Paso have value, too. What about us? What kind of value do we have? The kind that [defense counsel] says we have? I submit to you, no. We are worth just as much as anybody else.
>
> · · ·
>
> When this case is over with, the Defendants and the people you see on this side, with only a couple of exceptions, are going to be gone. They're never coming back to El Paso again.
>
> But you know what? Oskie is going to be here for the rest of his life—well, maybe not. Maybe he'll move, but he's going to be an El Pasoan for his life. Laura is going to be an El Pasoan for her life. Danny is going to be an El Pasoan for his life. They come in here with an attack on the family. . . .

After reviewing the record, we find that the above statements were invited and provoked by Cooper Tire's counsel. In closing argument, Cooper Tire's counsel stated:

> I find it incredible that these lawyers over here, sitting there collectively as a group, would sit there and applaud a man who gets in a vehicle and drives on a public highway under the influence of cocaine. It's not just the lawyers representing him. It's these folks here, too. One of their theories in this case is, in essence, cocaine is good. . . . But they find it easier to blame a company that is several states away. . . .

Cooper Tire also discussed the effect of the jury's verdict for Cooper Tire employees, stating:

I think it's also appropriate to think about Tommy Engledowl, David Boone, Roger Moore, and his son, Brian Moore, and how hard they work to feed their families because at the end of this trial, Mr. Myers, Mr. Darnell and I will have to look them in the eye and tell them about your verdict.

The complained-of jury arguments were clearly invited and provoked by Cooper Tire's counsel's depiction of hard working families contrasted to its attack on the Plaintiffs' values. Further, we find that the statements did not ask the jury to decide the case based upon local prejudice or ethnic unity. Having reviewed all of Cooper Tire's challenges to the Plaintiffs' jury argument, we conclude that Cooper Tire has failed to show incurable jury argument and therefore, overrule Issue Four.

## JURY MISCONDUCT

In Issue Five, Cooper Tire contends that it was entitled to a new trial because of material jury misconduct by which Cooper Tire asserts it was probably harmed. In conjunction with this issue, Cooper Tire also contends that the trial court erred in sustaining the Plaintiffs' objection to juror affidavits and testimony concerning a juror who consulted a dictionary to define negligence, a legal term in the trial court's charge.

■■■ We review the trial court's denial of a motion for new trial based on jury misconduct for an abuse of discretion. *Pharo v. Chambers County, Texas,* 922 S.W.2d 945, 948 (Tex.1996). To obtain a new trial based on jury misconduct, it must be shown that the misconduct occurred, it was material, and the misconduct probably caused injury. *See* Tex. R.Civ.P. 327(a); *Golden Eagle Archery, Inc. v. Jackson,* 24 S.W.3d 362, 372 (Tex. 2000).

Under Rule 327(b) of the Rules of Civil Procedure,

A juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict concerning his mental processes in connection therewith, except that a juror may testify whether any outside influence was improperly brought to bear upon any juror.

TEX.R.CIV.P.327(b); *see also* TEX. R.EVID.606(b).

In *Durbin v. Dal–Briar Corp.,* this Court defined "outside influence" to mean a force external to the jury and its deliberations. *Durbin v. Dal–Briar Corp.,* 871 S.W.2d 263, 272 (Tex.App.-El Paso 1994, writ denied). In *Durbin,* we stated that "[o]utside influence does not include information acquired by a juror and communicated to the others between the time the trial court instructs the jury and the time it renders a verdict, even where the information is not in evidence, and is unknown to jurors before trial." *Durbin,* 871 S.W.2d at 272. Further, we noted that outside influence in the form of information not in evidence must come from a non-juror. *Id.* Recently, the Texas Supreme Court clarified that Rules 606(b) and 327(b) prohibit considering the testimony about matters and statements occurring in the course of the jury's formal deliberations. *Golden Eagle Archery, Inc.,* 24 S.W.3d at 373–74. The Court maintained that the rules contemplate that an "outside influence" originates from sources other than the juror themselves. *Id.* at 370; *see also Soliz v. Saenz,* 779 S.W.2d 929, 932 (Tex.App.-Corpus Christi 1989, writ denied)(information gathered by a juror does not amount to an outside influence even if

introduced to other jurors for the purpose of prejudicing their votes).

According to affidavits from several jurors offered by Cooper Tire, one of the jurors, Irma Sagaribay, looked up the word "negligence" in her dictionary at home and the following day brought this definition into the jury room and shared it with her fellow jurors. The jurors admitted that the dictionary definition was used to avoid a mistrial and to render a unanimous decision that Mr. Mendez was not negligent.

On appeal, Cooper Tire argues that Ms. Sagaribay's conduct of improperly obtaining a dictionary definition of a legal term otherwise defined in the charge occurred outside jury deliberations, therefore the jurors' testimony was not precluded. Cooper Tires also asserts that the jurors' testimony did not reveal any aspect of jury deliberations and that the definition was an improper outside influence. We disagree with Cooper Tire's contentions.

 Ms. Sagaribay's conduct of copying a dictionary definition and sharing it with other jurors does not constitute an outside influence. While Cooper Tire characterizes Ms. Sagaribay's act of copying the definition as occurring outside formal jury deliberations, the alleged jury misconduct is in reality the act of sharing that definition with other jurors and its consideration during the course of their deliberations. The proffered affidavits clearly involved juror statements about matters occurring during their deliberations, which is precluded under the rules. We conclude the trial court did not err in sustaining the Plaintiffs' objection to the juror affidavits nor did the trial court err in denying Cooper Tire's motion for new trial on this ground. Issue Five is overruled.

## JURY FINDING ON DRIVER NEGLIGENCE

In Issue Nine, Cooper Tire challenges the jury's refusal to find causal negligence on the part of Oscar Mendez, Sr. and argues that the finding is against the great weight and preponderance of the evidence. In its pleadings, Cooper Tire alleged that Mr. Mendez was negligent and that his negligence proximately caused his injuries and the injuries and deaths of the other occupants in the minivan.[15]

### Standard of Review

 When a party attacks the factual sufficiency of an adverse finding regarding an issue on which it had the burden of proof at trial, it must demonstrate that the adverse finding is against the great weight and preponderance of the evidence. *Dow Chem. Co. v. Francis,* 46 S.W.3d 237, 242 (Tex.2001)(per curiam). In reviewing a challenge that the jury's finding is against the great weight and preponderance of the evidence, we must consider all the evidence, both the evidence which tends to prove the existence of a vital fact as well as evidence which tends to disprove it. *Piatt v. Welch,* 974 S.W.2d 786, 789 (Tex.App.-El Paso 1998, no pet.). It is for the jury to determine the weight to be given to the testimony presented and to resolve any conflicts in the evidence. *Id.* We cannot substitute our judgment for that of the jury, even if we would find a fact contrary to that found by the jury, provided that the jury finding is supported by the some probative evidence and is not against the great weight and preponderance of the evidence. *Piatt,*

---

**15.** The jury answered no to the following: "Did the negligence, if any, of Oscar Mendez, Sr. proximately cause his injuries and the injuries to Maria Luisa Mendez, Adela Duran and Manuel Duran?"

974 S.W.2d at 789. The jury's verdict will be overturned only if it is so contrary to the great weight and preponderance of the evidence as to be manifestly unjust. *Id.*

### Evidence of Driver Negligence

■■■ At trial, Mr. Mendez described his recollection of the accident to the jury. Mr. Mendez was driving along when he heard a bang on the left side in the rear of the minivan. As soon as he heard the big bang, the minivan went to the right. He thought he was going to go off the road, so he turned the steering wheel "a little bit" to make it straight. He recalled that he did not apply the brakes and took his foot off the gas pedal. Mr. Mendez could not remember what happened at the scene after that. According to Mr. Mendez, he lost control when the tire "popped."

Mr. Mendez admitted that on the preceding Friday, two nights before the accident, he split a gram of cocaine with Manuel Duran at a bar. They were also drinking scotch. Mr. Mendez denied using cocaine or other drugs on Saturday, but admitted to drinking four beers at his house on Saturday night while watching a boxing match and another four at Mr. Duran's house. Mr. Mendez denied using cocaine or drinking alcohol on Sunday, the day of the accident. He also denied seeing any beers in the van before the tire failure and denied feeling depressed or fatigued that day.

Mr. Mendez testified that he had previously owned a minivan and was familiar with how they operate. Over twenty years ago, Mr. Mendez attended a thirteen-month course in auto mechanics and training on tire service. He knew that a nail could cause a hole in a tire, could cause the low air pressure, and could cause damage to the tire. He also admitted that in 1982, he attended a two-week driver's education course at the police department, in which he learned how to handle a vehicle if it had a tire blowout or tread separation. Mr. Mendez also learned not to apply the brakes because this could cause loss of control and that one should hold on to the steering wheel and guide the vehicle in a straight direction in such circumstances.

Jose Gonzales, a witness to the accident, testified that he observed the minivan and never saw the brake lights applied. Mr. Gonzales assisted Mr. Mendez at the accident scene and was with him for forty-five minutes to an hour. Mr. Gonzales stated that he was kneeling next to Mr. Mendez, about twelve inches from Mr. Mendez' face, and did not smell alcohol on his breath. Mr. Mendez's pupils appeared normal and nothing indicated that he was on any type of drug or alcohol.

Police Officer Eugene Nestor testified that he was dispatched to the accident and later went to the hospital to draw Mr. Mendez's blood after being informed by another officer that at the scene he had detected an odor of alcohol coming from Mr. Mendez. Officer Nestor did not detect the use of alcohol, but Mr. Mendez was tested and the results showed zero for blood alcohol and a trace of cocaine, less than .05 milligrams, in his system. Officer Nestor concluded in his investigation of the accident that the driver had cut the steering wheel back and overcorrected. He also believed that the weight of the passengers contributed to the vehicle tripping and rolling.

Cooper Tire argues that the jury's refusal to find Mr. Mendez negligent is against the great weight and preponderance, pointing to evidence that a few hours after the accident, Mr. Mendez tested positive for cocaethylene, a cocaine and alcohol derivative. According to defense witness Rod McCutcheon, Mr. Mendez's cocaine use was sufficient to affect his judgment and impair his driving skills. There was

also evidence that Mr. Mendez overcorrected, even though he had learned what to do in the event of tire failure.

After reviewing all the evidence, we do not find that the jury's failure to find Mr. Mendez negligent was clearly against the great weight and preponderance of the evidence. Much of the challenged evidence turned on witness credibility and the resolution of conflicting evidence, matters within the jury's province. We conclude that the jury's finding is supported by some probative evidence and is not against the great weight and preponderance of the evidence. Issue Nine is overruled.

### JURY FINDING ON DURAN'S DAUGHTER

Melissa Snyder, in her individual capacity, was awarded $902,506.85 in damages and interest based on the wrongful death of Manuel Duran, as his alleged biological daughter. Cooper Tire asserts that evidence to support her status as Mr. Duran's daughter is both legally and factually insufficient.[16]

#### Sufficiency of the Evidence

 Melissa Snyder was awarded damages pursuant to the Wrongful Death Act, the purpose of which is "to provide a means whereby surviving spouses, children, and parents can recover for the loss of a family member by wrongful death." *Garza v. Maverick Market, Inc.,* 768 S.W.2d 273, 275 (Tex.1989); *see* TEX.CIV. PRAC. & REM.CODE ANN. § 71.004(a)(Vernon 1997). In *Garza,* the Court held that in a wrongful death action, an illegitimate child need not be recognized in accordance with other bodies of law not specifically applicable to the Wrongful Death Act. *Id.* However, if paternity is questioned, the alleged child must prove by clear and convincing evidence that he or she is a filial descendent of the deceased. *Id.* at 275–76.

 In considering a "no evidence" legal sufficiency challenge in a clear and convincing question in a wrongful death action, we consider all of the evidence in the light most favorable to the plaintiff, disregarding all contrary evidence and inferences to determine whether some or all of the evidence rises to the level of clear and convincing evidence in a particular case. *See Garza,* 768 S.W.2d at 276; *In re J.F.C.,* 96 S.W.3d 256, 268 (Tex.2002)(distinguishing the legal sufficiency standard of review of a federal constitutionally mandated clear and convincing evidence burden of proof from that imposed in *Garza* ). As to what evidence is clear and convincing, the *Garza* Court stated that "a fact finder must decide that question in each case." *Garza,* 768 S.W.2d at 276. Blood tests, if available, may help to show the alleged father's paternity. *Id.* Evidence of physical resemblance of the child to the alleged father is also admissible to determine paternity. *Id.* In addition, the alleged father's admissions bearing on his relationship to the child and evidence of periods of conception and gestation may be considered. *Id.*

In our factual sufficiency review, we consider all of the evidence in the record, including any evidence contrary to the judgment. *Plas–Tex, Inc. v. U.S. Steel Corp.,* 772 S.W.2d 442, 445 (Tex.1989). In *In re C.H.,* the Texas Supreme Court held that the appellate standard for reviewing

---

**16.** By its tenth issue, Cooper Tire is challenging the jury's finding that there was clear and convincing evidence that Melissa Denise Snyder is the biological daughter of Manuel Duran. The jury was instructed that "clear and convincing evidence" means the measure or degree of proof that produces a firm belief or conviction of the truth of the allegations sought to be established.

factual sufficiency in termination findings is "whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the State's allegations." *In re C.H.*, 89 S.W.3d 17, 25 (Tex.2002). *In re C.H.* clearly applies in parental terminations case where the clear and convincing evidence standard serves to protect due process interests. *See In re C.H.*, 89 S.W.3d at 25; *see also Santosky v. Kramer*, 455 U.S. 745, 769, 102 S.Ct. 1388, 1403, 71 L.Ed.2d 599 (1982).

Unlike in *In re J.F.C.*, the Court in *In re C.H.*, made no distinction between the "clear and convincing standard" in the context of wrongful death actions. *See In re J.F.C.*, 96 S.W.3d at 268. Rather, the *In re C.H.* Court stated that the traditional factual sufficiency standard, in which a court determines if a finding is so against the great weight and preponderance of the evidence that it is manifestly unjust, shocks the conscience, or clearly demonstrates bias, "is inadequate when evidence is more than a preponderance (more likely than not) but is not clear and convincing." *In re C.H.*, 89 S.W.3d at 25. Further, the Court stated that "[a]s a matter of logic, a finding that must be based on clear and convincing evidence cannot be viewed on appeal the same as one that may be sustained on a mere preponderance." *Id.* In light of the Court's clear directive in *In re C.H.*, we will apply the heightened standard of review to Cooper Tire's factual sufficiency challenge. Cooper Tire concedes that if the evidence is such that a reasonable jury could form a firm belief or conviction as to the truth of Melissa Snyder's allegations, then the evidence is factually sufficient. *See In re C.H.*, 89 S.W.3d at 25.

In the instant case, Melissa Snyder testified that Manuel Duran was her father. Ms. Snyder stated that Mr. Duran was involved in her life and attended her school activities. However, when Ms. Snyder was born in 1975, her mother, Guillermina Bonar, was married to Ron Snyder. Melissa's birth certificate names Mr. Snyder as her father. Melissa's mother and Mr. Snyder were not living together at the time of her birth, but Mr. Snyder did visit nine months before, to celebrate an anniversary. The 1977 Utah divorce decree dissolving the marriage between Guillermina Bonar and Mr. Snyder named Mr. Snyder as Melissa's father and ordered him to pay child support. Melissa testified that Mr. Snyder recognized that he was her stepfather. Photographs were admitted into evidence that showed Melissa with Mr. Duran and family members involved in family activities. These photographs were also offered to show a physical resemblance between Melissa and Manuel Duran. Melissa also testified about the probate court's determination of her status to Manuel Duran's estate and the probate court's order was admitted into evidence.

Guillermina Bonar testified that Manuel Duran was Melissa's father. Melissa's mother stated that Manuel Duran was the only person she was having sexual relations with during the time of Melissa's conception. Ms. Bonar denied the accuracy of the divorce decree and stated she was unaware of the divorce hearing and was not present when the decree was issued. Kevin Duran testified that Melissa was his full sister and was the daughter of Manuel Duran. Oscar Mendez testified that Melissa was Manuel Duran's daughter and that he was unaware of her having the last name of Snyder.

After viewing the evidence in a light favorable to the jury's finding, we conclude there is clear and convincing evidence that Melissa was the biological daughter of Manuel Duran for purposes of recovery

under the Wrongful Death Act.[17] Further, after viewing all the evidence, we conclude there was evidence such that the jury could form a firm belief or conviction as to the truth of Melissa's allegations. While Melissa's birth certificate and the Utah divorce decree named Mr. Snyder as Melissa's father, there was overwhelming evidence from which the jury could infer Melissa was the biological child of Manuel Duran. Issue Ten is overruled.

Having overruled all of Cooper Tire's issues on appeal, we affirm the trial court's judgment.

**17.** We also note that we would have reached the same conclusion under the sufficiency review standard announced in *In re J.F.C. See In re J.F.C.,* 96 S.W.3d at 266.